# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KIMBERLY D. SHARP,

                    Petitioner,

          v.                              CASE NO. 10-3100-JTM

KAREN ROHLING, et al.,

                    Respondents.


### MEMORANDUM AND ORDER

This matter is a petition for habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner, a prisoner at the Larned Mental Health Correctional Facility, Larned, Kansas, proceeds with counsel. This matter is ripe for review, and the court, for the reasons set forth, denies habeas corpus relief.

**Background**

***Procedural background***

Petitioner was convicted by a jury in the District Court of Shawnee County, Kansas, of felony murder and one count of kidnaping. She was sentenced to concurrent terms of life without the possibility of parole for 20 years and 61 months.

Prior to trial, petitioner filed a motion to suppress her statements given to Detective Bryan Wheeles. After a hearing conducted on December 11, 2006, the trial court denied the motion. Petitioner proceeded to trial and was found guilty by a jury. On direct appeal, she presented four claims, namely: (1) did the trial court err in denying her motion to suppress; (2) did the trial court err in limiting cross-examination of a witness; (3) did the trial court err in

admitting statements from two co-defendants; and (4) did cumulative error result in the denial of a fair trial. The Kansas Supreme Court rejected all of these claims and affirmed her conviction. *State v. Sharp*, 210 P.3d 590 (Kan. 2009). Petitioner timely filed this application for habeas corpus and seeks relief on the sole claim that the Kansas Supreme Court unreasonably applied clearly established law governing the admissibility of her confession.

**Factual background**

During the summer of 2006, petitioner was newly-divorced, the mother of two young children, and homeless. She resided with her children at the Topeka Rescue Mission. She met her three co-defendants, also homeless, during this period.

The victim, David Owen, was unemployed but engaged in "homeless reconciliation," a personal mission to help homeless persons reunite with their families. His approach was aggressive, and it frequently involved destroying homeless encampments, cutting up tents used by the homeless, throwing away their food, and then taking pictures of the destruction. Owen's picture was posted at the Mission, and new campers served by the Mission were warned about him.

Owen's family last had telephone contact with him on June 16, 2006, when he left a message, and they filed a missing person report on June 25, 2006. A cadaver dog located his remains in high grass near the Kansas River on July 2, 2006. The remains were approximately a quarter of a mile from the campsite of one of petitioner's co-defendants, Charles Hollingsworth.

On July 13, 2006, Detective Wheeles and Detective Mike Barron were investigating Owen's death. They found petitioner on North Kansas Avenue in the company of Hollingsworth. Because they believed she was

afraid of Hollingsworth, Detective Wheeles moved petitioner away from him and eventually took her to the police station. There, he told her she was not free to leave because he believed she had an outstanding warrant from another city. Detective Wheeles moved petitioner to an interview room and gave her *Miranda* warnings.

During the interview, Detective Wheeles told petitioner "as long as you're straight with me, you're not going to have any problems." R. XIII, 1:34:37 – 1:34:40; Appendix p.2.)  He also told her that he would be straightforward with her and would not lie to her during the investigation. (R. XIII; 1:35-25 – 1:35:35; Appendix, pp. 5-10.)

Petitioner told Detective Wheeles that she stayed in Hollingsworth's camp until June 14 when she checked back into the Mission. On the following day, she did her chores at the Mission and then went to the Hollingsworth camp until early evening. Petitioner reported to Wheeles that she, Hollingsworth, Carl Baker, and John Cornell were in the camp when Owen, the victim, came into the area.

According to petitioner, Owen told them they should not camp and that they should call their parents. He also said that if they had not been there, he would have destroyed the camp. Baker began to argue with Owen, and Owen said he was going to call the police and reached for his phone. Baker and Hollingsworth then knocked Owen to the ground, and Hollingsworth struck him. Owen begged to be let go and said he would not bother them anymore. Baker, though, said that he believed Owen would immediately report the encounter to police.

Petitioner reported to Wheeles that she told Hollingsworth and Baker, "I can't, I can't watch this." Hollingsworth then took Owen out of the camp. When petitioner went to check on them, she saw the victim kneeling on the ground and Hollingsworth standing over him with

an ax.

Petitioner thought Hollingsworth was going to kill Owen and urged him not to, saying "…no, don't do that, don't do that….I can't be an accessory….I got two kids that are coming home, you know." Hollingsworth replied, "okay,okay. Go get me a rope." Cornell brought a rope, and Hollingsworth and Baker used it to bind Owen's hands and feet. Baker stuffed a cloth into Owen's mouth.

Baker and Hollingsworth then dragged Owen away, leaving petitioner and Cornell at the camp. Cornell burned the victim's personal property, including his phone, notebooks, wallet, shoes and socks.

About 20 minutes later, Baker and Hollingsworth returned to the camp and told the others that they had tied Owen to a tree. Petitioner asked about the victim's condition, and Hollingsworth told her not to worry about it. Petitioner asked, "You didn't kill him, did you?", and Baker replied, "We didn't kill him yet." Baker then told petitioner he was teasing, and Hollingsworth told her they would take Owen some food later. Petitioner declined to go with them and said she needed to return to the Mission.

At some later time, petitioner learned that Owen had been found dead. She asked Hollingsworth and Baker about it and was told they had untied Owen and let him go. Neither made any admission to petitioner concerning Owen's death.

Petitioner cried as she described these events to Detective Wheeles, and he told her, "you're doing a good thing here. You're telling me exactly what you need to tell me and I hate having to make you go through this." Detective Wheeles asked petitioner to again describe the events, and as before, petitioner described herself only

as a witness to the encounter with Owen. She stated she had tried to dissuade Hollingsworth from harming Owen and said that Cornell had burned Owen's property at Baker's direction.

At that point, Detective Wheeles and petitioner had the following exchange:

Q. Okay, now, here's – here's an important part where you and I got to figure out. I know this is a scary deal for you. I appreciate everything that you've been honest with me about and I want you to answer this question for me honestly too, okay. Even – because I understand you're in a bad situation here where you just seen something like this happen and you're really probably very scared as to not go along could mean major problems for you.

A. Oh, yeah.

Q. Right? Like you could be in danger?

A. Oh, yeah.

Q. Did you help burn the stuff?

A. No.

Q. Did you have his phone and his bag at any point?

A. No, I didn't.

Q. Okay.

A. I didn't.

(R. XIII; 1:56:90 – 1:56:47; Appendix, p. 22.)

The conversation continued:

Q. If you were scared and you were helping him burn things because you were afraid they were going to hurt you if you didn't go along, you need to tell me right now. Are – are you picking up on what I'm telling you?

A. Uh-huh.

Q. You cannot, cannot hold anything back in this thing at all Kim, you can't. This is as serious as it comes.

A. I know, I know, I know.

Q. Okay.

A. Yeah, I helped burn.

Q. Okay. Now-

A. Am I going to jail?

Q. No, no, no, no, no, no, no, no, no, no. You are – you – you you are a witness to this thing so long as you do not do something dumb and jam yourself. If you were scared, explain to me that you were scared-

A. I was very.

Q. – when you did what you did. I understand the whole situation.

A. Okay.

Q. Just don't tell me no if I ask you something.

A. Okay.

Q. Okay?

A. Okay.

(R. XIII, 1:59:10 – 2:00:07-2:00:56; Appendix, pp. 26-27.)

After this, petitioner told Detective Wheeles that Hollingsworth told her and Cornell to burn the victim's belongings, and that she burned Owen's telephones and notebook. (R. XIII: 2:00:07 – 2:00:56; Appendix, pp. 26-27.) Petitioner also told Detective Wheeles that she burned the items because she feared both Hollingsworth and Baker.

Detective Wheeles told petitioner that Cornell and Baker would be arrested. Petitioner told him that her children were with Baker, and began to cry. Wheeles made arrangements to take petitioner to pick up the children, and they had the following exchange:

Q. Okay. We are going to leave your stuff in here because I'm going to be bringing – hopefully best case scenario, we'll get you and your kids back here. Now you're coming back here because we have a lot of things to sort out.

A. Uh-huh.

Q. You understand that, right? But you understand I'm trying to help you and your kids out in this situation?

A. Uh-huh. Is there – I don't know – is there any way that I could like go to a battered women's shelter or something?

Q. We'll work out some place, we'll work out some place, for you to go.

A. Because I can't go back to the mission.

Q. Yeah, I can only – let me handle one thing at a time, but I promise we'll get that worked out, okay? Let me grab one thing and I'll come get you. Can we get pretty close to this camp in a truck or do we have to walk? (R. XIII; 2:13:20 – 2:13:57; Appendix, pp. 30-31.)

Petitioner and her children later were reunited at the police station. Detective Wheeles took petitioner to the campsite to re-enact the events that took place there. (R. XIII, 4:26:54; App., p. 39.)

During that re-enactment, petitioner told Wheeles that after Hollingsworth took the victim out of the camp, she could hear shouting between them. Wheeles and the petitioner then had the following exchange:

Petitioner: I come around the corner and I say, "No baby, don't do that, don't do that, don't kill him." And he says….

Wheeles: Okay….

Petitioner: Okay….

Wheeles: Did you say "No, don't kill him," or did you say, "No, don't kill him here?"

Petitioner: "Don't kill him here."

Wheeles: You said, "Don't kill him here."

Petitioner: Right.

(R. XIII; 5:11 – 5:30).

Wheeles: Tell me the truth about this part, okay? Whose idea

was it to burn the stuff?

Petitioner: It was mine.

Wheeles: Okay, what did you say?

Petitioner: I said we have to burn it 'cause I don't need the evidence. I don't want to be tied to this.

Wheeles: Okay, so while he's got him tied, while Charles had got David tied up, you guy – you and John go back and start burning all –

Petitioner: And I told –

Wheeles: – all David's stuff.

(R. XIII; 7:25-7:35).

On their return drive to the police department, Wheeles told petitioner that the District Attorney would make the charging decision. (R. II, p. 17.) Later, at the police station, Wheeles and petitioner had this exchange:

Q. Kim?

A. Yeah.

Q. The district attorney has decided that you're going to be charged and go to jail.

A. What?

Q. Now, this is going to be sorted out.

A. You said – (Kimberly starts crying)

Q. Listen to me.

A. (Crying) you said –

Q. What else did I tell you, what else did I tell you? Okay. Stand up, stand up for me and put your hands behind your back.

A. (Crying) Can I call my aunt first?

Q. You can call from the jail. Stand up and put your hands behind your back. Listen to me.

A. (Crying) You lied to me.

Q. Listen to me. We told you that the district attorney was going to make the decision, didn't we?

A.: (Crying) You lied to me.

Q. You can be upset all you want to, but here's the deal. Somebody is dead and you played a role in it.

A. (Crying) You lied to me. You tricked me.

Q. That's not true. I told you every step of the way what was going on. The district attorney's office is going to make that decision.

A.: (Crying) No, you did not say that to me. You did not say that.

Q.: Kim, Kim, Kim.

A: (Crying) You did not-

Q. Did you play a role in this man's death?

A. (Crying) Yes, sir, but I was cooperating.

Q. How do you not go to jail if your play a role in somebody's death?

A. (Crying) How could you do this … to me?

Q. I'm not doing anything to you. You did it to yourself. You played a role and now you've got to –

A. (Crying) This is [expletive].

Q. All right. (Speaking to second officer, referring to Sharp's purse) I haven't really gone through this, I will, but you may want to do that.

A. (Crying) This is [expletive].

(R. XIII, 6:25:14 to end; App. pp. 40-42).


Petitioner filed a motion to suppress her statements to Wheeles, and at the hearing on that motion, Wheeles testified that he told petitioner on their return trip to the police station from the re-enactment that the district attorney would make the charging decisions in the matter. The trial court denied the suppression

motion.

Petitioner subsequently was convicted by a jury. The Kansas Supreme Court affirmed the convictions. *State v. Sharp*, 210 P.3d 590 (Kan. 2009).

**Standard of review**

This matter is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, where the state courts have adjudicated a claim, habeas corpus relief is available only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402 (2000).

> "[C]learly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case sub judice. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context. The absence of clearly established federal law is dispositive under § 2254(d)(1)." *Welch v. Workman*, 639 F.3d 980, 991 (10th Cir. 2011)(internal punctuation and citations omitted).

Where the state court correctly applied federal law to deny relief, the federal court will consider only whether the law was applied in an objectively reasonable manner. *Bell v. Cone*, 535 U.S. 685, 699 (2002); *see McLuckie v. Abbott*, 337 F.3d 1193, 1197 (10th Cir. 2003)(habeas court may grant relief only where it concludes state court's application of law was objectively unreasonable). The Tenth

Circuit recognizes "objective unreasonableness is somewhere between clearly erroneous and unreasonable to all reasonable jurists." *Maynard v. Boone*, 468 F.3d 665, 670 (10th Cir. 2006)(emphasis omitted).

A federal court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 410-11. Rather, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, ___ U.S. ___, ___, 131 S.Ct. 770, 786 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Finally, "the determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## Discussion

The sole claim in this action is that the trial court erred in failing to suppress petitioner's custodial statements in violation of the Fifth Amendment. Petitioner makes five specific allegations of error by the Kansas Supreme Court, namely, that it: (1) erred in holding that voluntariness is a question of fact; (2) ignored the record in holding that Detective Wheeles never made any promises to petitioner; (3) unreasonably determined that petitioner was not operating under promises in making statements; (4) unreasonably defined the concept of conditional promises; and (5) unreasonably found that any purported promise about helping petitioner's children was only a collateral benefit to her and did not bear on the

voluntariness of her statements.

The Fifth Amendment guarantees that "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.

Where an incriminating statement is the result of coercive police conduct, it is deemed involuntary and inadmissible. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "A defendant's confession is involuntary if the government's conduct causes the defendant's will to be overborne and his capacity for self-determination critically impaired." *United States v. McCullah*, 76 F.3d 1087, 1101 (10th Cir. 1996)(quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)).

However, misrepresentations, ruses, and trickery by questioning authorities do not render an otherwise voluntary confession involuntary. *Frazier v. Cupp*, 394, U.S. 731, 739 (1969).

Thus, the determination of the voluntariness of a statement "requires careful evaluation of all the circumstances of the interrogation." *Mincey v. Arizona*, 437 U.S. 385, 401 (1978). A court considering whether a defendant's statements were voluntary must consider five factors, under a totality of the circumstances test: (1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment. *See Schneckloth*, 412 U.S. at 226. Likewise, the interrogation should be evaluated in light of "the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition and mental

health," and whether *Miranda* warnings were given. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993)(internal citations omitted).

The question of whether a confession is voluntary depends on "whether the confession was 'extracted by any sort of threats or violence, obtained by any direct or implied promises, however slight, by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976)(quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).

The mere existence of promises or threats does not render a confession involuntary. The test is whether the defendant's will has been "overborne" or his "capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. 218, 225.

**Voluntariness inquiry**

Petitioner first asserts that the Kansas Supreme Court erred in failing to identify voluntariness as a question of law and deferring to the factual findings of the trial court.

Respondent notes, however, that the Kansas Supreme Court, in fact, defined the appropriate standard of appellate review as review of "the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard." *State v. Sharp*, 210 P.3d 590, 597 (Kan. 2009).

The *Sharp* decision clearly identifies the determination of whether a confession is voluntary as "a legal conclusion requiring de novo review." *Id*. at 598 (citations omitted). Likewise, the Kansas Supreme Court, citing *State v. Brown*, 173 P.3d 612 (Kan. 2007), identified the factors to be considered in evaluating the voluntariness of a confession and described the inquiry as one to be determined under the totality of the circumstances. *Id*. These factors

are essentially the same as those identified in *Schneckloth.*

This court concludes that the Kansas Supreme Court applied the correct standard and did not improperly defer to the findings of the state trial court.

**Promises to petitioner**

Petitioner next argues the state courts erred in finding that Detective Wheeles made no promises to her.

In analyzing this claim, the Kansas Supreme Court first acknowledged that police coercion may include making a promise that induces a party to make self-incriminating statements. The court noted that advice to a defendant to tell the truth does not render a subsequent confession involuntary. Rather, "the promise must concern action to be taken by a public official; it must be such that it would be likely to cause the accused to make a false statement to obtain the benefit of the promise; and it must be made by a person whom the accused reasonably believes to have the power or authority to execute it." *Sharp*, 210 P.3d at 598-99 (quoting State v. Brown, 173 P.3d 612 (2007)).

The trial court based its decision on its observation of petitioner in the courtroom, the testimony of Detective Wheeles, review of the recorded interviews and the recorded re-enactment, and the arguments of counsel. It found that petitioner had received *Miranda* warnings, that the length of the detention was not unusual, that petitioner was given water and breaks during her interviews, that

the recordings of the interviews showed her to be relaxed and calm, that her responses were clear, and that she was cooperative and did not appear to be under duress or operating under any promises. *Sharp*, 210 P.3d at 606.

At the suppression hearing, Detective Wheeles testified that he gave petitioner *Miranda* warnings, that she agreed to speak with him, that he told her to tell the truth and not to lie, and that he sometimes confronted her when he believed she was not telling him the truth.

Wheeles testified that he had not made promises or threats to petitioner. Defense counsel conducted cross-examination on that point as follows:

> [Counsel] Let me ask you this: when she asked you if she was going to jail and you said, 'No,no,no,no,no,no, I promise you,' is that a promise?

> [Wheeles] I don't recall. Did I say 'I promise you?' If it – yeah, that would be considered to be a promise. I thought she was going to be a witness in this case, as I've stated earlier.

The Kansas Supreme Court concluded the record contained sufficient evidence to allow the trial court to find that the statements made by Wheeles were no more than part of his repeated admonitions to petitioner to tell the truth. It likewise considered the possibility that the trial court might have found that Wheeles made a promise but petitioner was not influenced by that promise. The court found that under either scenario, the factual findings of the trial court could not be disturbed under the governing standard of review.

Under the AEDPA, the findings of the trial court are factual

findings that are entitled to great deference both by the appellate court and by this court on habeas review. In the context of a confession, "subsidiary questions … often require the resolution of conflicting testimony of police and defendant. The law is therefore clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable." *Miller v. Fenton*, 474 U.S. 104, 117 (1985).

The court concludes the record provides adequate support for the findings of the state courts. The conversation between petitioner and Wheeles, when considered as a whole, reflects that petitioner was advised of her *Miranda* rights and was admonished repeatedly to be truthful. The record does not suggest either that Wheeles engaged in unduly coercive tactics or that petitioner was overborne by the detective's statements.

### *Petitioner's mental state*

Petitioner asserts the state courts unreasonably determined that she was not operating under promises when she made self-incriminating statements.

The trial court reached that conclusion, and the Kansas Supreme Court found this determination was supported by substantial evidence that petitioner had received, at most, a conditional promise, and that she had not met its conditions. The Kansas Supreme Court pointed out that Wheeles testified that he considered petitioner to be a witness rather than a suspect during their interviews and that he advised her

that she was not going to jail unless she did something "dumb" that would "jam" her. Petitioner's later incriminating admissions, acknowledging that she participated in burning Owen's belongings to destroy evidence and that she told Hollingsworth not to kill Owen at the campsite, thus violated the conditional promise.

Viewed under the deferential standards imposed by the AEDPA, the decision of the Kansas Supreme Court must be sustained. The state courts' conclusion concerning petitioner's mental state at the time of her statements does not reflect an unreasonable application of Supreme Court precedent, nor has petitioner rebutted the presumption that the state court determination of facts is correct.

### Definition of conditional promise

Petitioner claims the Kansas Supreme Court unreasonably found that any promises made by Wheeles were conditional promises, that is, that petitioner would be only a witness in the investigation so long as she did not incriminate herself. She contends that the conditional promise was that she would be only a witness so long as she cooperated, and points to this exchange with Wheeles as an example:

> Q. No, no, no, no, no, no, no, no, no, no. You are – you – you you are a witness to this thing so long as you do not do something dumb and jam yourself. If you were scared, explain to me that you were scared-
>
> A. I was very.
>
> Q. – when you did what you did. I understand the whole situation.
>
> A. Okay.
>
> *Sharp,* 210 P.3d at 599.

The Kansas Supreme Court, in contrast, analogized the conditional promise to petitioner to well-established examples in criminal law, including a conditional grant of immunity, the grant of a pardon subject to conditions, and the grant of probation and parole. It concluded that any promise made by Wheeles to petitioner was conditioned upon her not providing any information to inculpate herself, citing Wheeles's statements in the record that petitioner was not going to jail so long as she did nothing to "jam" herself.

The court finds petitioner has not shown that the reasoning of the Kansas Supreme Court is an unreasonable application of federal law or was otherwise contrary to clearly established federal law, as contemplated by § 2254(d). While petitioner's argument finds support in the dissenting opinion of Justice Johnson, the court finds this determination is one upon which "fairminded jurists could disagree", *Richter*, 131 S.Ct. at 786, and concludes the petitioner is not entitled to relief on this claim.

### *Collateral benefit*

Finally, petitioner alleges the Kansas Supreme Court unreasonably found the purported promise of Wheeles to help her children was a collateral benefit. Under Kansas case law cited by the court, an incriminating statement induced by a collateral benefit, that is, a benefit to another, normally will be considered voluntary unless the surrounding circumstances suggest the promise was of a nature to render the admission untrustworthy. *Sharp*, 210 P.3d at 605-06 (citing *State v. Holloman*, 731 P.2d 589, 597 (1987) and *State*

*v. Pitman*, 433 P.2d 550 (1967)).

In dissent, Justice Johnson disagreed with this analysis, pointing out that not only did petitioner's remarks clearly show she anticipated a placement for herself as well as her children, but that he believed it was error to view a promise to help petitioner's children as a lesser kind of benefit. *Sharp*, 210 P.3d at 612.

The United States Supreme Court has addressed similar issues without an apparent distinction between a personal and a collateral benefit. In *Lynumn v. Illinois*, 372 U.S. 528 (1963), the Court determined a confession was coerced where the petitioner, who had no criminal history, was surrounded by police officers who threatened her with the loss of financial aid for her infant children and the removal of the children unless she confessed. Likewise, in *Rogers v. Richmond*, 365 U.S. 534, 539 (1961), the Court found that unfounded threats to take family members into custody may render a confession involuntary.

While the court finds the collateral benefit distinction drawn by the Kansas Supreme Court is not persuasive, it does not follow that petitioner is entitled to relief. Rather, the question remains whether, under the totality of circumstances, the statements of Wheeles operated to coerce incriminating statements from petitioner. The record reflects that both the state trial court and the Kansas Supreme Court carefully examined the record and concluded that petitioner's will had not been overborne by the questioning of Detective Wheeles. The conclusion that the interrogation did not

result in coerced self-incrimination was not an unreasonable assessment of the facts and did not contravene clearly-established federal law regarding the admissibility of inculpatory statements.

**Certificate of Appealability**

Pursuant to Rule 11 of the Rules Governing Section 2254 Proceedings, the court must grant or deny a certificate of appealability upon entering a final order adverse to the petitioner. "A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicates which specific issue or issues satisfy [that] showing." 28 U.S.C. §2253(c)(2).

A petitioner meets this standard by showing that the issues presented are debatable among jurists, that a court could resolve the issues differently, or that the issues deserve additional proceedings. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000)(citing *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)).

After considering the record in this case, the court concludes that a certificate of appealablility should be granted.

**Conclusion**

For the reasons set forth, the court concludes the petition for habeas corpus must be denied.

IT IS, THEREFORE, BY THE COURT ORDERED the petition for habeas corpus is dismissed and all relief is denied.

IT IS FURTHER ORDERED that the certificate of appealability is hereby granted.

Copies of this Memorandum and Order shall be transmitted to the parties.

**IT IS SO ORDERED.**

DATED:  This 28th day of March 2014, at Wichita, Kansas.


                              s/J. Thomas Marten
                              J. THOMAS MARTEN
                              United States District Judge